IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GRAYSON WALKER                                               PLAINTIFF

        v.                                 CIVIL NO. 08-5234

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                   DEFENDANT

**AMENDED MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Grayson Walker, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.**    **Procedural Background:**

Plaintiff protectively filed his current application for DIB on January 20, 2006, alleging an inability to work since October 1, 2004, due to migraine headaches; neck, shoulder, hip and knee pain; memory problems; and poor night vision. (Tr. 90, 149). An administrative hearing was held on September 17, 2007, at which Plaintiff appeared with counsel and testified. (Tr. 39-65).

By written decision dated February 6, 2008, the ALJ found that during the relevant time period Plaintiff had an impairment or combination of impairments that were severe. (Tr.12). Specifically, the ALJ found Plaintiff had the following severe impairment(s): status post femur

AO72A
(Rev. 8/82)

fracture with open reduction internal fixation (ORIF). (Tr. 12). However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 12). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform a full range of medium work. (Tr. 12). Specifically, the ALJ found Plaintiff could lift and/or carry twenty-five pounds frequently, fifty pounds occasionally; and could stand and/or walk for a total of six hours each in an eight-hour workday with normal breaks. With the help of a vocational expert, the ALJ determined Plaintiff could perform his past relevant work as a mail clerk. (Tr. 16).

Plaintiff then requested a review of the hearing decision by the Appeals Council which denied that request on August 28, 2008. (Tr. 3-6). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Doc. 6, 9).

**II.      Evidence Presented:**

At the administrative hearing before the ALJ on September 17, 2007, Plaintiff, who was thirty-eight years of age, testified he obtained a high school education. (Tr. 44). The record reflects Plaintiff's past relevant work consists of work as an administrative mail clerk. (Tr. 61-62).

Prior to the relevant time period, Plaintiff sought treatment for sinus drainage and congestion, chronic back pain, obstructive sleep apnea, cysts on his neck, migraine headaches, knee pain, hyperlipidemia, fatigue, and appendicitis. ( 193-200, 219, 246-256, 277-280,312-396).

Medical evidence from the relevant time period reflects the following. On December 16, 2004, Plaintiff complained of bilateral knee pain, more on the right than on the left. (Tr. 191, 310). Plaintiff reported he recently changed jobs and now worked in construction applying tiles on the floor. Dr. Eleanor F. Bucaycay noted Plaintiff's report of a severe burning sensation on the medial side when he bent his right knee. Dr. Bucaycay noted Plaintiff denied pain when walking. Plaintiff reported he took Darvocet for pain and that it was not working. Upon examination, Dr. Bucaycay observed minimal tenderness on palpation of the right knee; however, Plaintiff experienced severe pain when on bent position on the floor. (Tr. 192). Plaintiff's range of motion was "relatively" normal. Plaintiff underwent x-rays of his right knee that revealed evidence of a previous ORIF of the right femur fracture; no evidence of acute fracture or dislocation; and no arthritic changes. (Tr. 201). Dr. Bucaycay diagnosed Plaintiff with degenerative joint disease, status post surgery time three years ago. Plaintiff was to continue taking Darvocet and Ibuprofen. Dr. Bucaycay recommended an orthopedic consult.

On December 20, 2004, Plaintiff called to report he was having pain anytime he put weight on his right knee. (Tr. 190, 307).

On December 30, 2004, Plaintiff underwent an orthopedic consult performed by Dr. Oscar L. Henderson. (Tr. 189, 303). Plaintiff reported his right knee pain was "steadily getting worse [over] the last 6 months." (Tr. 188). Plaintiff reported he worked in construction. (Tr. 188, 305). Dr. Henderson noted Plaintiff broke his right femur three years ago on a wake board at the lake. Dr. Henderson noted Plaintiff reported experiencing severe knee pain that "almost makes him pass out." Plaintiff reported he experienced this pain when he knelt or touched his knee to the floor. Dr. Henderson noted Plaintiff's pain was lateral to the patellar ligament in to

the patella, but not particularly over the ligament or patella. Dr. Henderson noted when he examined Plaintiff's knee he did not get the impression that Plaintiff was having any pain anywhere around the knee if Plaintiff was distracted from the exam. Plaintiff had a negative Lockman and drawer test. Dr Henderson found no instability to varus or valgus stress and no indication of a positive McMurray test. Dr. Henderson opined Plaintiff's x-rays were unremarkable. Dr. Henderson diagnosed Plaintiff with arthralgia, right knee. Dr. Henderson opined Plaintiff's pain seemed to be more of an arthralgia rather than an internal derangement and suggested a referral to discuss the removal of hardware in hopes of some pain relief.

On January 25, 2005, Plaintiff established himself as a new patient at the Veteran's Administration Health Care Clinic (VA), with Dr. Marc Stevens, for an evaluation of worsening right knee pain. (Tr. 218). Plaintiff reported his knee pain had been worsening over the last seven months and was associated with pressure or impact events upon the knee. Upon examination, Dr. Stevens noted Plaintiff was alert, oriented and in no acute distress. (Tr. 219). Dr. Stevens noted Plaintiff had a slightly limited right leg flexion due to pain, but passive range of motion was without deficit. All of Plaintiff's knee ligaments were intact and there was no noted warmth, erythema, effusion, trauma, or other evidence of abnormality. Plaintiff also underwent x-rays of his right knee and right femur. (Tr. 181-182). Plaintiff's right knee was "essentially normal" and his right femur revealed a healed fracture. Due to the absence of objective findings, Dr. Stevens opined Plaintiff's pain was due to "fat pad syndrome" and advised Plaintiff to begin taking anti-inflammatory medication and to rest his knee as much as possible. Dr. Stevens further advised Plaintiff to obtain a knee brace that would protect his knee from painful impact/stimuli. Plaintiff was to return in six weeks for an evaluation.

On February 4, 2005, Plaintiff presented for a follow-up regarding the problems with his right knee. (Tr. 184, 298). Dr. Bucaycay noted Plaintiff was evaluated at the VA in Little Rock and was advised to increase his Ibuprofen dosage and to return in six weeks to be re-evaluated. Plaintiff also reported a "knot" on the back of his neck which had been slightly painful since yesterday. Dr. Bucaycay diagnosed Plaintiff with degenerative joint disease, right knee with hardware; hyperlipidemia; sleep apnea, currently tolerating CPAP well; and Furunculosis. Plaintiff was to follow-up with the VA in Little Rock in three weeks and was advised on dietary modifications. (Tr. 184-185, 299).

On April 14, 2005, Plaintiff returned for a follow-up of his right knee pain. (Tr. 217). Dr. Laurie Hughes noted Plaintiff had a history of pain for the last year but the pain had been worsening over the last few weeks. Plaintiff reported the Ibuprofen had not helped alleviate his pain. Plaintiff reported frequent "giving away" of his leg. Upon physical examination, Dr. Hughes noted Plaintiff had full range of motion of the knee. Dr. Hughes noted no pain with varus or valgus stresses and no tenderness along the patellar facet. Plaintiff was markedly tender just proximal to Gerdys tubercle and just anterior to the insertion of the iliotibial band. Dr. Hughes also noted some mild swelling in this area. Plaintiff was diagnosed with "IT band bursitis/insertional pain just proximal to Gerdys tubercle." Plaintiff was given an injection into his iliotibial band bursa which gave Plaintiff almost immediate relief of pain. (Tr. 218). Dr. Hughes referred Plaintiff to physical therapy for two weeks. Plaintiff was to return for an evaluation in six weeks.

On May 18, 2005, Plaintiff underwent a physical therapy consultation. (Tr. 181-184, 295). Mr. Donald W. Austin, RPT, noted Plaintiff's report that his knee pain had been less

painful since receiving a cortizone injection three to four weeks ago. Mr. Austin noted prior to the injection, Plaintiff reported excruciating pain from any contact with his knee. Plaintiff reported this had been troublesome as he worked in construction installing floors. Plaintiff reported a "high interest" in fitness and "much interest" in martial arts. Mr. Austin noted Plaintiff tolerated the physical therapy session well and was to return on May 26th. On August 1, 2005, Plaintiff was discharged because he failed to make a follow-up appointment. (Tr. 184).

On June 2, 2005, Plaintiff returned to the VA clinic for an evaluation of his right knee. (Tr. 215). Dr. Eric H. Gordon noted Plaintiff received an injection in his knee the previous day which had worked "very well." Plaintiff reported an almost complete resolution of his pain. Dr. Gordon noted Plaintiff had been taking Motrin, in addition to the injection, and had started a physical therapy program. Plaintiff reported overall he was doing well but requested another injection prior to his starting a more vigorous training regimen. Upon examination, Dr. Gordon noted Plaintiff basically had a normal knee exam with full range of motion. Dr. Gordon noted the swelling that was observed at the previous visit was almost nonexistent. Plaintiff's knee was stable to varus valgus anterior and posterior stress. Plaintiff remained slightly tender to palpation over the IT band insertion area near the tubercle. Dr. Gordon noted Plaintiff could not receive another injection yet, but he did prescribe a steroid dose pack to be taken orally. Plaintiff was to return in three months if he continued to have problems.

On November 4, 2005, Plaintiff reported for a follow-up for his bilateral knee problems, migraine headaches, hyperlipidemia, low back pain and obstructive sleep apnea. (Tr. 178-180. 290). Plaintiff denied new problems or new complaints and denied acute or chronic pain. Dr. Laura L. Eckles noted Plaintiff had received cortisone injections with good relief of his knee

AO72A
(Rev. 8/82)

pain. Dr. Eckles noted Plaintiff's migraine headaches were stable and controlled with Darvon/Phenergan, as well as, Zolmitriptan as needed. Dr. Eckles noted Plaintiff was doing well on a CPAP for his obstructive sleep apnea. After examining Plaintiff, Dr. Eckles assessed Plaintiff with the following: bilateral knee pain, followed by orthopedics, stable on ibuprofen; migraine headaches, stable on Zolmitriptan, Darvon/Phenergan; hyperlipidemia, much improved with control of diet; obstructive sleep apnea, stable on CPAP; and nodule posterior on right neck, will request ENT consult for further evaluation. Plaintiff was encouraged to work on an exercise and weight loss program. (Tr. 179). Plaintiff was to return in one year or sooner if symptoms arose.

On December 2, 2005, Plaintiff underwent a CT scan of his neck and chest which revealed multiple "shotty" lymph nodes but no evidence of an enhancing mass lesion. (Tr. 221). After examining Plaintiff, Dr. Mimi S. Kokoska opined the nodules were most likely benign but noted Plaintiff wanted them excised. Dr. Kokoska noted there was no "suspicious cervical lymphadenopathy." On December 29, 2005, the nodules were excised. (Tr. 208-209).

On April 17, 2006, Dr. Ronald Crow, a non-examining, medical consultant, completed a RFC assessment stating that plaintiff, could occasionally lift or carry fifty pounds, frequently lift or carry less than twenty-five pounds; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that postural, manipulative, visual, communicative or environmental limitations were not evident. (Tr. 228-235). After reviewing all the evidence, Dr. Steve Owens affirmed Dr. Crow's findings on August 22, 2006. (Tr. 240).

On August 6, 2006, Plaintiff presented to the emergency department of the VA with complaints of chronic migraines with nausea, vomiting and photophobia. (Tr. 287). Plaintiff was given Toradol and Phenergan. Dr. Glenn J. Craig noted Plaintiff reported that this was one of his "usual headaches." Dr. Craig noted Plaintiff was service connected for headaches as he had a head trauma in the past. Plaintiff was diagnosed with a post traumatic headache. Plaintiff was to follow up with Dr. Eckles for his next regular appointment.

On August 16, 2006, Plaintiff complained of pain on twisting his head and occasional numbness down his arms bilaterally. (Tr. 282). Plaintiff reported a remote head trauma to the neck but no recent exacerbations. Plaintiff also complained of a recent onset of pain down his left leg. Upon examination, Dr. Eckles noted Plaintiff exhibited mild tenderness to palpation of the neck and moderate limitation of motion, with pain, with all cervical spine movements. Dr. Eckles did not observe any tenderness to palpation of Plaintiff's lower back. Dr. Eckles treated Plaintiff's pain with a medrol dose pack and recommended x-rays of Plaintiff's neck and back which revealed a normal lumbar and cervical spine. (Tr. 243-244). Dr. Eckles opined Plaintiff may need a neurosurgical evaluation.

On September 1, 2006, Plaintiff called the VA clinic to report his medication was not helping to improve his pain. (Tr. 281). Ms. Linda Walker, R.N., noted Plaintiff's x-rays from the previous week were negative. (Tr. 242-243). Dr. Eckles ordered a CT scan of Plaintiff's cervical spine on September 5, 2006.

On October 2, 2006, plaintiff underwent a CT scan of the cervical spine that revealed rotoscoliosis involving the lower cervical spine; probable mild degenerative changes involving C5 and C6 vertebral bodies; and no neuroforamina or canal stenosis. (Tr. 241).

On November 3, 2006, Plaintiff complained of occasional right-sided hip pain at the site of a prior surgery especially with a change in the weather. (Tr. 425). Dr. Eckles noted Plaintiff had been seen for neck pain and that a CT scan revealed mild scoliosis and mild degenerative joint disease. Dr. Eckles noted Plaintiff's active problems consisted of degenerative joint disease, hyperlipidemia, alopecia and migraine headaches. Plaintiff reported no worsening of his symptoms and fair control of his pain with medication. (Tr. 426). Plaintiff was to return in one year or as needed.

On November 9, 2006, Plaintiff sought treatment for a migraine headache. (Tr. 418-422). Plaintiff reported experiencing nausea, emesis and photophobia. Plaintiff was diagnosed with a migraine headache and was given Demerol and Phenergan

Due to continued elevated Triglycerides plaintiff was started on Gemfibrozil on February 5, 2007. (Tr. 416).

On June 9, 2007, Plaintiff sought treatment for the sudden onset of left-sided back pain. (Tr. 410). Plaintiff reported his pain started in his mid back and radiated into his hip. Plaintiff reported the pain started when he was helping to give his dog a bath. Plaintiff's active problems were listed as degenerative joint disease, hyperlipidemia, alopecia and migraine headaches. (Tr. 411). Plaintiff was diagnosed with lower back strain and prescribed medication. (Tr. 412-413).

**III.   Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be

affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

### A.   The Evaluation Process:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal

an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. § 404.1520. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § 404.1520.

## IV. Discussion:

Plaintiff contends that the ALJ erred in concluding that the Plaintiff was not disabled. Defendant contends the record supports the ALJ's determination that Plaintiff was not disabled through the date of the ALJ decision.

### A. Subjective Complaints and Credibility Analysis:

In disability determinations, credibility assessments are the province of the ALJ. Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). We believe the ALJ adequately evaluated the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

1984), and conclude there is substantial evidence supporting the ALJ's determination that Plaintiff's complaints were not fully credible.

The medical evidence of record reveals Plaintiff sought treatment for bilateral knee problems and right leg pain that began after Plaintiff sustained an injury to his right hip and knee in 2001 that resulted in the need for an ORIF. During the relevant time period, the medical evidence reflects Plaintiff sought treatment for bilateral knee pain soon after starting a job laying tiles in December of 2004. Plaintiff underwent cortizone injections to relieve his knee pain and in April of 2005 reported almost immediate pain relief after the injection. We note, an impairment which can be controlled by treatment or medication is not considered disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (citations omitted). The record reflects Plaintiff was prescribed physical therapy for his knees; however, Plaintiff was discharged from physical therapy in August of 2005 for failure to make a follow up appointment. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001)(claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). Furthermore, in November of 2005, Dr. Eckles noted Plaintiff's knee pain was being followed by orthopedics and was stable on ibuprofen. See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain). The ALJ clearly addressed Plaintiff's knee and leg impairments and we find substantial evidence to support the ALJ's determination that these impairments are not disabling.

The record reflects Plaintiff also sought treatment for neck and back pain. Plaintiff underwent x-rays of his lumbar and cervical spine in September of 2006 that were essentially normal. Due to some persistent pain, Plaintiff underwent a CT scan on October 2, 2006, and

-12-

after reviewing the scan, Dr. Eckles opined Plaintiff had mild scoliosis and degenerative joint disease. In November of 2006, Plaintiff reported no worsening of his symptoms and fair control of his pain with medication management. See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain). Seven months later, in June of 2007, Plaintiff sought treatment for left-sided back pain that started after he helped wash his dog. At that time, Plaintiff was diagnosed with a lower back sprain and prescribed medication. While Plaintiff may indeed experience some degree of pain, the medical evidence indicates that his condition is not of a disabling nature. See Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997) (upholding ALJ's determination that claimant was not disabled even though she had in fact sustained a back injury and suffered some degree of pain).

Plaintiff also alleges disabling sleep apnea that was diagnosed in August of 2003. In November of 2005, Dr. Eckles noted Plaintiff's sleep apnea was stable with the use of the CPAP machine and the medical evidence does not indicate Plaintiff complained of problems associated with this impairment during the time period in question. Furthermore, medical records from June of 2007 do not list Plaintiff's sleep apnea as an active problem. Based on the record as a whole, we find substantial evidence to support the ALJ's determination that Plaintiffs' sleep apnea was not a disabling impairment.

Plaintiff argues that the ALJ failed to properly address Plaintiff's obesity in conjunction with his other impairments. A review of the record reveals Plaintiff did not allege obesity as a disabling impairment when he applied for benefits nor did he testify to problems he experienced due to obesity at the hearing before the ALJ. See Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir.2003) (claim of obesity impairment waived on appeal where claimant did not raise any

limitation from the impairment in his application or during hearing). Further, medical records fail to establish Plaintiff was diagnosed with obesity by a medical professional. The record shows Plaintiff was encouraged to eat properly and to exercise but no limitations due to his weight were noted by an examining physician. Accordingly, we do not find the ALJ erred in not addressing obesity when making the disability determination.

Plaintiff testified that his medication, specifically the Phenergan, made him feel "tired all the time." (Tr. 46-47). A review of the record fails to show Plaintiff complained of on-going side effects caused by his medication. Had Plaintiff truly experienced these on-going side effects, we believe he would have reported this to his treating physicians.

Plaintiff's subjective complaints are also inconsistent with evidence regarding his daily activities. Medical records dated December of 2004, two months after the alleged onset date, show Plaintiff reported he recently started a new job working in construction applying tiles on the floor. Through testimony at the hearing and in paperwork associated with applying for benefits, Plaintiff reported he was able to take care of his personal needs, to do some household chores; to help his daughter with her homework and to attend her sporting events; to take care of his dog; to shop for grocery once a week for up to two hours; to drive; to prepare simple meals; and to mow the lawn, with breaks. This level of activity belies Plaintiff's complaints of pain and limitation and the Eighth Circuit has consistently held that the ability to perform such activities contradicts a Plaintiff's subjective allegations of disabling pain. See Hutton v. Apfel, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimant's application supported by substantial evidence where daily activities– making breakfast, washing dishes and

AO72A
(Rev. 8/82)

clothes, visiting friends, watching television and driving-were inconsistent with claim of total disability).

Therefore, although it is clear that Plaintiff has some limitations, he has not established that he is unable to engage in any gainful activity. See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities support Plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### B. RFC Assessment:

We next turn to the ALJ's assessment of Plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Lewis v.

AO72A
(Rev. 8/82)

Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered the medical assessments of examining agency medical consultants, Plaintiff's subjective complaints, and his medical records. Plaintiff's capacity to perform this level of work is supported by the fact that Plaintiff's treating and examining physicians placed no restrictions on his activities that would preclude performing the RFC determined. See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-imposed restrictions militates against a finding of total disability). Based on the record as a whole, we find substantial evidence to support the ALJ's RFC determination.

### C. Hypothetical Proposed to Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, we find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, we find that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments do not preclude him from performing his past relevant work as a mail clerk. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### D. Veteran's Administration Disability Rating:

Finally, in making the disability determination, the ALJ acknowledged Plaintiff had been rated a fifty percent service-connected disability for his migraine headaches. The ALJ should consider the VA's finding of disability, Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir.1998), but

the ALJ is not bound by the disability rating of another agency when he is evaluating whether the claimant is disabled for purposes of social security benefits, 20 C.F.R. § 404.1504; Fisher v. Shalala, 41 F.3d 1261, 1262 (8th Cir.1994) (per curiam) ("There is no support for [the claimant]'s contention that his sixty-percent service-connected disability rating equates with an inability to engage in any substantial gainful activity under social security standards."). Based on the above, we find the ALJ properly addressed the VA's disability rating.

## V.  Conclusion:

Based on the foregoing, we recommend affirming the ALJ's decision, and dismissing plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of December 2009.

/s/ *Erin L. Setser*
  HON. ERIN L. SETSER
  UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)